***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, *Page 2 
or rehear the parties. The Full Commission affirms and modifies the Opinion and Award of Deputy Commissioner Glenn and enters the following Opinion and Award:
 *********** EVIDENTIARY MATTERS
1. Defendant Liberty Mutual Insurance Company filed a Motion to Receive Additional Evidence on July 23, 2010. Defendant moved, pursuant to Rules 609 and 701 of the Workers' Compensation Rules of the North Carolina Industrial Commission, for an Order allowing Defendant Liberty Mutual to include in the record additional evidence, including Plaintiff's updated short-term and long-term disability records, on the ground that such records are relevant to the appeal of this matter. Plaintiff responded and objected to Defendant Liberty Mutual's Motion. After consideration of the written and oral arguments of the parties, Defendant Liberty Mutual's Motion is hereby GRANTED.
2. Defendant Argonaut Insurance filed a Motion to Receive Additional Evidence on June 28, 2010. Defendant Argonaut moved, pursuant to Rules 609 and 701 of the Workers' Compensation Rules of the North Carolina Industrial Commission, for an Order allowing Defendant Argonaut to include in the record additional evidence, shown as Exhibit 1 and Exhibit 2 attached to Defendant's motion, on the ground that such records are relevant to the appeal of this matter. Plaintiff responded and objected to Defendant Argonaut's Motion. After consideration of the written and oral arguments of the parties, Defendant Argonaut's Motion is hereby GRANTED.
3. Defendant Argonaut Insurance filed a Motion to Take Judicial Notice of Federal and North Carolina Payroll Recordkeeping Requirements on July 29, 2010. FOR GOOD CAUSE *Page 3 
SHOWN, Defendant Argonaut Insurance's Motion is hereby GRANTED and the Full Commission takes judicial notice accordingly in this Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case. That all the parties are bound by and subject to the North Carolina Workers' Compensation Act. That all parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
2. The Plaintiff was employed full-time by Defendant-Employer A.C. Corporation in 1971, from 1976 until 1977, and again from March 3, 1980 until June 1997.
3. It is stipulated that Defendant-Employer A.C. Corporation was insured by Argonaut Insurance from April 1, 1996 until March 31, 1998, PMA Insurance from April 1, 1987 until March 31, 1996, Liberty Mutual from April 1, 1985 until March 31, 1987, The Home Insurance Company from April 1, 1982 until March 31, 1985, and it had an endorsement that excluded coverage at various RJ Reynolds job sites, In Liquidation/ North Carolina Guaranty Association (NCIGA) pursuant to the North Carolina Insurance Guaranty Association Act, N.C. Gen. Stat. § 58-48-1, et seq. (hereinafter "NCIGA"), United States Fire Insurance Company from April 1, 1980 until March 31, 1982, Ohio Casualty from April 1, 1979 until March 31, 1980, and General Accident Insurance Company now known as One Beacon from April 1, 1971 until March 31, 1979. *Page 4 
4. The following exhibits were admitted into evidence at the hearing before the Deputy Commissioner:
 a. stipulation #1, medicals, forms, discovery and etc., some 1127 pages.
5. The issues to be determined from this hearing are as follows:
 a. Whether Plaintiff developed an occupational disease as a result of his employment with Defendant-Employer?
 b. If so, to what, if any, workers' compensation benefits is Plaintiff entitled to recover under the North Carolina Workers' Compensation Act?
 c. When was Plaintiff last injuriously exposed?
 d. What was Plaintiff's average weekly wage?
 e. Whether Defendants are entitled to any credits?
 f. Whether Plaintiff timely filed a claim for laryngeal cancer in this matter?
 g. Whether Plaintiff has a covered claim within the NCIGA statutory obligations under N.C. Gen. Stat. § 58-48-35(a)(1) or any other provision of the North Carolina Insurance Guaranty Association Act, N.C. Gen. Stat. § 58-48-1, et seq.?
 h. If Plaintiff is entitled to any benefits, then are any of the responsible Defendants entitled to a credit or offset for any third party recoveries by Plaintiff, and if so, to what extent?
 ***********
The Pre-Trial Agreement along with its attachments and any additional stipulations are hereby incorporated by reference as though they were fully set out herein.
 *********** *Page 5 
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on or about August 15, 1940, and was 68 years old on the date of the hearing before the Deputy Commissioner. He completed the 10th grade and then went to welding school at Newport News shipyard in Virginia. After a year as a welder and pipefitter in the shipyard, Plaintiff worked for a number of companies as a welder, pipefitter, or mechanic between 1960 and 1979.
2. Plaintiff first started working for Defendant-Employer in 1971 as a welder and pipefitter, and at the end of 1971 Plaintiff left Defendant-Employer's employ and went to work for other Employers until 1976, at which time he returned to work for Defendant-Employer until 1977. Thereafter, Plaintiff left Defendant-Employer's employ until March 3, 1980, when he returned and remained until June 1997. While Plaintiff worked for Defendant-Employer as a pipefitter and welder, his job caused him to work at various industrial sites throughout the country.
3. Plaintiff's job with Defendant-Employer required him to work on and replace pipes, boilers, and HVAC units for the different clients Defendant-Employer contracted with for the replacement or repair of the same. Plaintiff's job also required him to climb over, under, stand on and lie on, the insulation that covered pipes and other equipment located in the plants he worked at in order to work on or replace the pipes or equipment that Defendant-Employer had contracted to service. Also as a part of his job, Plaintiff had to normally remove insulation from the pipes and other equipment so that he could either repair or replace as a part of his job duties. In order to remove the insulation from the pipes or other equipment, Plaintiff would tear it off *Page 6 
with his hands, beat it off with a hammer, and/or blow it off with an air hose. After removing the insulation, Plaintiff was required to clean up the insulation and remove it from the site and place it in the trash. Most of the time, he would have to sweep the insulation up from the floor, thereby creating a significant amount of dust which got all over Plaintiff and his clothes. Plaintiff was also required to replace gaskets that were located at the joints of the pipes that he was working on. To remove the gaskets he would have to use a wire brush, a hammer to beat them off, and an air hose to blow the gasket off the pipes he was working on. This created dust that again would get all over him and his clothes.
4. The pipes that Plaintiff normally worked around were insulated because they carried steam, hot water, chemicals, and cooled air from HVAC units. While working around the HVAC units, the fans normally continued to blow, and as he removed the insulation, the air from the fans created dust from the material that he was removing and would cause it to get all over Plaintiff and his clothes.
5. Over the years of performing his job, Plaintiff learned that much of the insulation and gaskets that he worked with and around contained asbestos. At some point after asbestos containing insulation was being removed from plants and buildings, Plaintiff learned that much of the insulation used contained fiberglass. Plaintiff did not take any formal classes that taught him how to tell the difference in the different kinds of insulation, but as he worked with the various insulations, he learned how to tell the difference from the insulation that contained asbestos and the insulation that did not.
6. As a result of Plaintiff's job with Defendant-Employer, he was continuously exposed to insulation that contained asbestos and when he was removing and moving over, on, or under pipes that were covered with asbestos containing insulation, he disturbed the fibers causing *Page 7 
the fibers to become air borne and causing Plaintiff to breathe in the fibers that he was disturbing. Additionally, when Plaintiff was removing the insulation that contained asbestos from the pipes and other equipment that he had to repair or replace, this action caused the fibers to become air borne and Plaintiff would breathe the fibers into his lungs. This continued throughout his employment with Defendant-Employer up until his last date of employment. It should be noted that Plaintiff worked the last years with Defendant-Employer as a supervisor, but in this position he continued to do the job he normally performed with the added responsibility of supervising other employees.
7. While Plaintiff was working for Defendant-Employer the dangers of asbestos became apparent to both the government and industry, and there was an effort to remove it from plants and buildings and to greatly reduce its use. But some of the insulation and other material that had been installed in the plants and buildings have never been removed and Plaintiff continued to encounter this material until he stopped working for Defendant-Employer.
8. In 1997, Plaintiff was diagnosed with laryngeal cancer. As a result, his larynx and portions of his neck were removed. Since that surgery, he has been unable to talk without the assistance of a mechanical voice box. He must also breathe through a "stoma" which is a hole in his neck.
9. Plaintiff was told by Defendant-Employer that he could no longer work as he could not communicate effectively and that created a safety hazard. Therefore, he stopped working in 1997 and has not worked since. Plaintiff applied for, and was approved for, social security disability. Plaintiff was not advised by any doctor that his laryngeal cancer was related to his employment with Defendant-Employer until 2007.
10. In 2007, Plaintiff was diagnosed with lung cancer, and as a result of the same he *Page 8 
underwent radiation and chemotherapy for treatment. He is still receiving treatment for this disease.
11. During Plaintiff's treatment, chest x-rays were taken and reviewed. There were abnormalities on the x-rays in addition to the cancer. His treating physicians diagnosed asbestosis. On February 7, 2008, Dr. Arthur L. Frank, M.D., opined that Plaintiff had asbestosis. Dr. Frank also determined that his lung and laryngeal cancers were related to the asbestos exposure Plaintiff had while employed by Defendant-Employer.
12. Plaintiff would go to various plant sites and perform maintenance and repair services to the pipes and equipment. This job required Plaintiff to dismantle piping. He would remove insulation from the area where he was working. He would then take the piping apart and make repairs. When he worked on the piping he would have to crawl on other pipes, stand on pipes, and lay on pipes. He testified that often times, the insulation on the piping was ragged and deteriorated to the point that the insulation was visible and crumbling from the piping. He often had to remove insulation with his bare hands.
13. Working with piping was common for Plaintiff. There was a significant amount of piping in the facilities where he worked. Plaintiff was around insulated piping virtually every day. It was common for Plaintiff to come in contact with and disturb the insulation. When Plaintiff removed the insulation either by using his hands, a hammer or other tools, the insulation would fall onto the floor around him and he would have to clean up the insulation. He would pick up pieces with his hands and what he did not pick up, he would dry sweep. He would also use an air hose to blow insulation dust off the pipes or equipment and to finish cleaning up. Plaintiff's job with Defendant-Employer was very dusty.
14. Plaintiff believes that most of the insulation he worked with and around contained *Page 9 
asbestos. This belief was also held by Plaintiff's co-workers and supervisors.
15. One of Plaintiff's supervisors was D.C. Sanders. Mr. Sanders confirmed Plaintiff's position with Defendant-Employer as well as how he performed that position. Mr. Sanders also agreed that much of the insulation Plaintiff worked with and around contained asbestos and that Plaintiff's job caused the fibers to become airborne and that Plaintiff would breathe in the fibers as a result of the same.
16. Mr. Sanders was also of the opinion that Plaintiff was exposed to asbestos while working for Defendant-Employer and that this exposure continued throughout Plaintiff's employment until he stopped working for Defendant-Employer.
17. Mr. Richard Krueger was called as a witness in this matter. Mr. Krueger received a B.S. degree in chemical engineering in 1956. He then spent several years working for companies that built instrumentation for industrial steam systems. His job was to design systems for plants. In this job, he had to learn about the different types of insulation and its different uses. He was trained and educated in the area of asbestos and how to tell the difference between asbestos and other materials.
18. Mr. Krueger later went to work for Flexitallic Gasket Company as marketing director and in this position he worked mostly in the field visiting customers. He instructed his customers in how to handle gaskets. He went to various types of plants including refineries, chemical plants, pulp and paper, pharmaceutical, electric plants, and water treatment plants. Flexitallic made asbestos gaskets and was the top supplier in the world of asbestos gaskets. In his position, Mr. Krueger visited over 600 plants to evaluate the steam systems and to recommend the insulation needs. *Page 10 
19. Mr. Kreuger indicated that Flexitallic made a particularly good gasket to be used on steam lines and boilers. Because it was such a good gasket, they dyed the gasket blue and patented this blue gasket. Mr. Kreuger indicated that all blue gaskets used to help seal the pipe joints were Flexitallic gaskets. Further, Mr. Kreuger indicated that all of the blue gaskets contained asbestos.
20. Mr. Krueger is of the opinion that working with these gaskets is hazardous. He indicated that employees who remove these old gaskets with wire brushes create asbestos dust which is breathed in and can cause disease. He indicated that Flexitallic was concerned about and recognized this risk.
21. Plaintiff worked with blue gaskets quite often and was required to remove them as a part of his job with Defendant-Employer, and he normally did so with a wire brush. When he did, it created dust which he, in turn, would breathe in.
22. Mr. Kreuger recalled that he visited several of the plants where Plaintiff had worked, including the American Tobacco plant. As a part of his job, Mr. Kreuger surveyed the entire plant and its steam lines. Mr. Kreuger recalls that the plants had asbestos containing insulation throughout the plant on the piping and in the boiler rooms. He recalls that much of the insulation was damaged and coming off the equipment it covered.
23. Documents that were introduced at the hearing reflected the presence of asbestos containing material, including insulation, in many of the facilities where Plaintiff had worked and that some of the insulation and other materials had been removed.
24. There was no evidence offered by Defendants to indicate that Plaintiff was not exposed to asbestos containing material while he was employed by Defendant-Employer. Even *Page 11 
Defendant's expert, Dr. John Craighead acknowledged that Plaintiff was most probably exposed to asbestos while working for Defendant-Employer.
25. Plaintiff was exposed to asbestos for more than thirty (30) days in a seven (7) month period during his employment with Defendant-Employer. Plaintiff's exposure continued until his last day of work with Defendant-Employer on or about June 20, 1997.
26. Plaintiff's treating physician, Dr. Barry W. Sigal, is a specialist in pulmonary and critical care medicine, board certified in both fields for the past twenty-two (22) and ten (10) years, respectively. He primarily treats patients with lung illness, including patients like Plaintiff with asbestosis.
27. Dr. Sigal first saw Plaintiff on June 2, 2006, upon referral due to an abnormal chest x-ray.
28. After a review of the CT scan and given Plaintiff's history of occupational asbestos exposure, Dr. Sigal diagnosed Plaintiff with asbestosis.
29. Further CT scans in 2007 showed the presence of cancer in Plaintiff's lungs and in four lymph nodes. Dr. Sigal is of the opinion that Plaintiff's lung cancer was not related to his laryngeal cancer but that it was related to and caused by his exposure to asbestos while employed by Defendant-Employer. Further, Dr. Sigal opined that Plaintiff's lung cancer was caused by a combination of his smoking and asbestos exposure.
30. Dr. Timothy Collins is an oncologist that provided care and treatment to Plaintiff as a result of his cancer. Dr. Collins began seeing Plaintiff in January 2007 and continues to treat him presently. Plaintiff was referred to Dr. Collins for evaluation and treatment of his squamous cell lung cancer. Dr. Collins opined that Plaintiff's lung cancer was a primary cancer and did not come from his laryngeal cancer. Dr. Collins was of the opinion that Plaintiff's lung cancer *Page 12 
metastasized to four lymph nodes which he characterized as separate and distinct organs. Dr. Collins opined that Plaintiff's lymph node cancer is not a primary cancer but metastasized to the lymph nodes from the lung cancer.
31. Dr. Collins is of the opinion that Plaintiff's lung cancer was a result of his asbestos exposure while employed by Defendant-Employer and his smoking.
32. Dr. Caroline Chiles, a physician and professor at Wake Forest University who has been a professor of radiology since 1985 and is board certified in diagnostic radiology with specific training from NIOSH in determining lung disease on chest radiology, was asked by Plaintiff's treating doctors to review films of Plaintiff's chest.
33. After Dr. Chiles saw the chest films of Plaintiff she felt that Plaintiff had exposure to asbestos as there was evidence of "extensive calcified pleural plaques" and "interstitial markings at the lung bases". She determined that these abnormalities were consistent with asbestosis.
34. Dr. Jill Ohar is a physician at Wake Forest University School of Medicine Baptist Hospital. She is on the faculty and teaches pulmonary, critical care, and internal medicine. She is board certified in pulmonary and internal medicine.
35. Dr. Ohar examined Plaintiff and reviewed his medical records, and based upon her examination and review, she determined that Plaintiff is suffering from asbestosis as well as calcified pleural plaques and diaphragmatic plaques.
36. Dr. Ohar is of the opinion that Plaintiff suffers from asbestosis, asbestos-related pleural plaques, laryngeal cancer caused by asbestos, and lung cancer caused by asbestos. She stated that her review of the literature verifies a link between asbestos and laryngeal cancer and that this position is the majority view. *Page 13 
37. Dr. Ohar opined that Plaintiff's lung cancer had spread, metastasized, from Plaintiff's lungs to four lymph nodes.
38. Dr. Ohar additionally opined that Plaintiff's exposure to asbestos while working for Defendant-Employer increased his risk for the development of laryngeal cancer and lung cancer.
39. Dr. Arthur Frank reviewed this matter for Plaintiff. Dr. Frank is an occupational medicine physician who is board certified in internal medicine since 1978 and occupational medicine since 1979. Dr. Frank writes the questions for the board certification in occupational medicine, and is currently professor of Public Health and Chairman of the Department of Environmental and Occupational Health at Drexel University, and a professor of medicine in the pulmonary division of the Department of Internal Medicine. He has specialized in occupational pulmonary disease and asbestos-related diseases since 1968.
40. In this case, Dr. Frank reviewed the medical records of Plaintiff including treatment records, pathology reports, and radiology reports.
41. Dr. Frank believes the majority of literature supports a link between asbestos and laryngeal cancer. He also stated that NIOSH and OSHA take the position that there is a link between asbestos and laryngeal cancer.
42. Dr. Frank determined that Plaintiff developed several asbestos related conditions. He believes that Plaintiff has asbestosis, asbestos related pleural disease, and he has lung cancer and laryngeal cancer both caused by asbestos. Dr. Frank is of the opinion that asbestos was the causative factor, or a significant contributing factor, in the development of Plaintiff's lung cancer and laryngeal cancer. Dr. Frank also believes that smoking was a contributing factor in the development of both conditions. *Page 14 
43. Dr. Frank opined that Plaintiff's work with Defendant-Employer would have increased his risk for the development of laryngeal cancer and lung cancer.
44. Dr. Crim is a pulmonologist and B-reader at the University of North Carolina, in Chapel Hill, North Carolina. Dr. Crim has been certified by the National Institute of Occupational Safety and Health to read radiology for the presence of lung disease. He is board certified in internal medicine and pulmonary medicine.
45. Dr. Crim read the x-rays of Plaintiff and found abnormalities consistent with asbestosis and pleural plaquing. Dr. Crim believes the majority of the literature supports a link between asbestos and laryngeal cancer.
46. Dr. Gary Bluemink is a pathologist who has been board certified in anatomical and clinical pathology since 1975. Dr. Bluemink is of the opinion that Plaintiff's exposure to asbestos while employed by Defendant-Employer caused or contributed to his development of laryngeal cancer. Dr. Bluemink is of the opinion that smoking and asbestos exposure played causative roles in the Plaintiff's development of laryngeal cancer.
47. Dr. Bedrossian is a pathologist who is board certified in clinical and anatomical pathology. He reviewed Plaintiff's case. Dr. Bedrossian is of the opinion that Plaintiff's asbestos exposure while working for Defendant-Employer was a significant contributing factor in the development of his laryngeal cancer. Dr. Bedrossian opined that Plaintiff had a squamous cell laryngeal cancer which is usually the type of tumor that develops from asbestos exposure in the larynx. He indicated that the bulk of the research links laryngeal cancer and asbestos, and that the EPA and American Cancer Society have stated that there is a link between asbestos and laryngeal cancer. Dr. Bedrossian believes that Plaintiff's smoking history also played a role in the cancer and cannot be excluded. He said that it is scientifically impossible to separate the roles of the *Page 15 
asbestos and smoking in the laryngeal cancer. Dr. Bedrossian indicated that smoking and asbestos have a synergistic effect on the development of cancer. Individually they create a risk for cancer, when combined the risk is greatly increased. He opined that there is no question in Plaintiff's case that the cigarette smoking and asbestos combined to increase the risk for the development of his laryngeal cancer.
48. Dr. Craighead is a pathologist and currently board certified in anatomical and clinical pathology. Dr. Craighead does not believe that asbestos causes laryngeal cancer. On this, he disagrees with OSHA, EPA, the National Cancer Institute, and the Cleveland Clinic. He claims that these organizations rely on outdated literature and do not effectively train their personnel.
49. Dr. Craighead has testified in other cases before the Commission. In those cases involving stomach and colon cancer, he used various reports to support his position. However, some of those same reports take the position that laryngeal cancer is caused by asbestos. He ignored those reports in this case and questioned the credibility of those reports.
50. Dr. Craighead was listed as Defendants' only witness and the only basis for denial of the claim. However, Defendants did not send anything to Dr. Craighead until after the hearing. Dr. Craighead did not express an opinion in this case to defense counsel until after the hearing.
51. Greater weight is given to the testimony and opinions of Drs. Crim, Sigal, Frank, Bedrossian, Ohar, Collins, Bluemink, and Chiles, as opposed to that of Dr. Craighead.
52. Plaintiff's employment with Defendant-Employer exposed him to asbestos which in turn was a causative factor in his development of laryngeal cancer, lung cancer, asbestosis, and pleural plaquing. *Page 16 
53. Plaintiff's lymph node cancer is not a primary cancer, but rather is a natural and direct result of the metastasizing of Plaintiff's lung cancer.
54. Plaintiff was last exposed to asbestos the last week of his employment with Defendant-Employer which was on or about June 20, 1997. Defendant-Employer was insured by Argonaut Insurance from April 1, 1996, until March 31, 1998. Therefore, Argonaut Insurance was the carrier on risk at the time of Plaintiff's last injurious exposure.
55. Plaintiff is presently and has been physically incapable of employment since June 20, 1997. In 1997, he underwent an operation for his laryngeal cancer. His voice box was removed as was a section of his neck. He was left without the ability to speak except with the aid of an electronic voice box. He was also left with a "stoma" which is a hole in his throat. It is through this hole that he breathes. He remains in this condition today. Because of this hole in his neck, he is not permitted to work in dusty environments.
56. Stephen Carpenter is an expert in rehabilitation counseling, vocational evaluations, job placement, ergonomic job analysis, medical case management, and other related rehabilitation/vocational services. Mr. Carpenter is of the opinion that Plaintiff's occupation is classified as skilled, medium to heavy, labor intensive welding and construction work. Mr. Carpenter determined that the skills possessed by Plaintiff will only transfer to similar occupations. He explained that welding requires certain skills that are not utilized in other occupations. Therefore, his skills would only transfer to jobs that are similar to welding and construction occupations.
57. Mr. Carpenter conducted several vocational tests. He found that Plaintiff functions at a seventh (7th) grade level which would cause him to have difficulty understanding and applying written material and simple mathematics. He also found Plaintiff to perform in the *Page 17 
tenth (10th) percentile in dexterity.
58. Mr. Carpenter indicated that the electronic voice box and Plaintiff's inability to communicate effectively would severely limit his occupational possibilities.
59. Mr. Carpenter concluded that Plaintiff could not do a full range of sedentary work, and that Plaintiff would be unable to be competitive in the economy.
60. The Defendants offered no evidence to dispute Plaintiff's inability to work.
61. Plaintiff is totally disabled from working and has been since July 1, 1997, due to his laryngeal cancer.
62. Defendants had reasonable grounds for defense of Plaintiff's claim and did not engage in stubborn, unfounded litigiousness.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff contracted laryngeal cancer, lung cancer, lymph node cancer, asbestosis, and pleural plaques as a result of his employment with Defendant-Employer as a welder and pipefitter. Asbestosis is an occupational disease under the Act. N.C. Gen. Stat. § 97-53(24). Plaintiff's employment placed him at increased risk for the development laryngeal cancer, lung cancer, lymph node cancer, and pleural plaques than the general public not so exposed.
2. Plaintiff's last injurious exposure to the hazards of asbestos in excess of thirty (30) working days, or parts thereof, within seven (7) consecutive months occurred during his employment with Defendant-Employer during 1997. Therefore, Defendant-Employer is the responsible employer. N.C. Gen. Stat. § 97-57. *Page 18 
3. Defendant Argonaut Insurance is the responsible carrier and is, therefore, liable for payment of compensation due Plaintiff pursuant to the Act. N.C. Gen. Stat. § 97-57.
4. Defendants failed to file a Form 22. Plaintiff's weekly compensation rate is set at $754.00 per week, the maximum compensation rate for 2007. N.C. Gen. Stat. § 97-2(5).
5. To prove disability under the Act, an injured employee must establish that he is incapable of earning the same wages he earned at the time of contracting the disease or receiving the injury, at his same job or any other employment. Hilliard v. ApexCabinet Co., 54 N.C. App. 173, 282 S.E.2d 828 (1981), rev'd onother grounds, 305 NC 593, 290 S.E.2d 682 (1982). An employee may prove he is incapable after injury of earning the same wages he earned before injury in any other employment in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but has, after a reasonable effort been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of pre-existing conditions, i.e., age, inexperience, or lack of education, to seek other employment; (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury. Russell v. Lowe's ProductionDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). Plaintiff has met his burden. The medical evidence in this case shows Plaintiff is not capable of gainful employment. Plaintiff is permanently or temporarily totally disabled pursuant to N.C. Gen. Stat. § 97-29 as a result of his laryngeal cancer beginning on July 1, 1997.
6. Plaintiff is entitled to compensation for damage to an organ for damage to his lungs for asbestosis. N.C. Gen. Stat. § 97-31(24). *Page 19 
7. Plaintiff is entitled to compensation for damage to an organ for damage to his lungs for lung cancer. N.C. Gen. Stat. § 97-31(24).
8. Plaintiff is entitled to compensation for damage to an organ for damage to four lymph nodes for cancer to those lymph nodes. N.C. Gen. Stat. § 97-31(24).
9. Plaintiff is entitled to medical treatment incurred or to be incurred related to his asbestosis, laryngeal cancer, lung cancer, pleural plaquing, and lymph node cancer, as is reasonable and necessary pursuant to N.C. Gen. Stat. §§ 97-25 and 97-25.1.
10. Defendants are entitled to a credit for short-term and long-term disability compensation paid to Plaintiff from 1997 to 2001, through a program wholly funded by Defendants. N.C. Gen. Stat. § 97-42.
11. Defendants' defense of this claim was not unreasonable or based in stubborn, unfounded litigiousness. As such, they are not liable for sanctions. N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following:
 ORDER
1. Subject to a credit and the attorney's fees hereinafter approved, Defendants shall pay compensation to plaintiff at the rate of $754.00 per week from July 1, 1997, through the present and continuing until such time as Plaintiff returns to work or until further order of the Commission. The compensation which has accrued shall be paid in a lump sum to Plaintiff subject to the attorney's fee hereinafter approved.
2. Plaintiff is awarded $40,000 for damage to the lungs from lung cancer and lung asbestosis. *Page 20 
3. Plaintiff is awarded $20,000 for damage to his lymph nodes from cancer to the lymph nodes.
4. Defendants shall pay for all medical expenses incurred or to be incurred by Plaintiff as a result of this compensable injury when bills for same have been submitted to and approved by the North Carolina Industrial Commission, for so long as such evaluations, treatments, and examinations may reasonably be required to effect a cure, give relief and/or lessen Plaintiff's period of disability.
5. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded to Plaintiff in paragraphs one (1), two (2), and (3) above, is hereby approved to be deducted from the lump sums accrued and thereafter, every fourth (4th) payment due Plaintiff shall be paid directly to Plaintiff's attorney.
This the 22nd day of September, 2010.
 S/___________________
 DANNY LEE McDONALD
 COMMISSIONER
CONCURRING:
S/_______________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/_______________ LINDA CHEATHAM COMMISSIONER *Page 1